SAMUEL J. BUFFONE, JR.
District of Columbia Bar No. 1721688
Email: *sam@blackandbuffone.com*
BLACK & BUFFONE PLLC
1400 Eye Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 997-8562

HERBERT H. RAY, JR.
(*pro hac vice pending*)
Alaska Bar No. 8811201
Email: *hray@schwabe.com*
SCHWABE, WILLIAMSON &
WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125
Facsimile:  (503) 796-2900

Attorneys for Plaintiffs IMC SHIPPING CO. PTE.
LTD. and AYU NAVIGATION SDN BHD

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

IMC SHIPPING CO. PTE. LTD.
3 ANSON ROAD #06-01
SPRINGLEAF TOWER
SINGAPORE 079909, and

AYU NAVIGATION SDN BHD,
SUITE 3A.2, LEVEL 3A
MENARA IMC 8
JALAN SULTAN ISMAIL
50250 KUALA LUMPUR, MALAYSIA

                                        Plaintiffs,

            vs.

UNITED STATES OF AMERICA,
ACTING BY AND THROUGH THE
UNITED STATES COAST GUARD
NATIONAL POLLUTION FUNDS
CENTER,

                                        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:23-cv-563

Jury Trial:  No

**COMPLAINT TO VACATE AND
SET ASIDE FINAL AGENCY
ACTION AND FOR OTHER RELIEF**

The Complaint of IMC Shipping Co. PTE. Ltd. ("IMC") and Ayu Navigation Sdn Bhd, ("Ayu") through its undersigned counsel, and against Defendant, the United States of America, acting by and through the United States Coast Guard National Pollution Funds Center, avers as follows:

## **INTRODUCTION**

1.      This case seeks to stop the United States National Pollution Funds Center ("NPFC") from creating a new rule, during the course of adjudicating an administrative claim, that conflicts with the rule it previously applied in prior claim adjudications and with clear statutory text, and then applying that new rule retroactively and arbitrarily to deny portions of the claim. All of these actions are foreclosed by the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* This Complaint seeks a declaratory judgment and other relief to correct these improper actions by the United States.

2.      This case is about reimbursement from the Oil Spill Liability Trust Fund, which is administered by the NPFC pursuant to the Oil Pollution Act of 1990. Plaintiffs are entitled to, but were denied, reimbursement from the Oil Spill Liability Trust Fund for natural resource damages assessment costs incurred by the Plaintiffs to perform certain actions that Plaintiff's took at the direction of federal and state agencies that were designated as trustees for natural resources that were impacted by an oil spill from Plaintiff's vessel.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 2 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

3.      The NPFC has never issued regulations addressing the reimbursement of Responsible Parties for natural resource damages assessment costs incurred under the Oil Pollution Act of 1990. Instead, the NPFC has articulated the rules governing such reimbursements in a series of written administrative claim determinations, and general regulations governing the submission of claims against the Oil Spill Liability Trust Fund.

4.      More than a year after Plaintiffs submitted their claim for reimbursement, the NPFC announced a new rule that provides that in order for a Responsible Party to obtain reimbursement of natural resource damages assessment costs, those costs had to be incurred at the express direction of the trustee and are costs the trustee would have otherwise incurred. The Oil Pollution Act of 1990 does not allow the Coast Guard to exclude natural resource damages assessment costs incurred by a Responsible Party by this narrow standard. Further, the Coast Guard had never before applied this rule when adjudicating administrative claims for reimbursement of such costs by Responsible Parties. Allowing the Coast Guard to retroactively apply the new rule is arbitrary, capricious, and an abuse of discretion. This retroactive application is particularly egregious here when some of the costs were incurred over 15 years before the Coast Guard articulated the new rule. Finally, even under the Coast Guard's stated new rule, the trustee did in fact direct Plaintiffs' actions, so Plaintiffs' costs are reimbursable even under the new rule. The Coast Guard's application of the new rule is therefore based on errors of law and fact, and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 3 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

1

## THE PARTIES

2
3        5.      At all material times, IMC was and is a limited liability company organized

4   and existing under the laws of Singapore, with its principal place of business in Singapore.

5   IMC was the operator of the M/V SELENDANG AYU ("the Vessel"). In December 2004,

6   the Vessel was driven ashore after it developed a problem with its main engine during a

7   fierce winter storm in the Bering Sea and Aleutian Islands of Alaska and was destroyed.

8   The grounding of the Vessel resulted in a large oil spill. The grounding and loss of the

9   vessel and the resulting oil spill are referred to in this Complaint as "the Incident."

10

11        6.      At all material times, Ayu was and is a limited liability company organized

12   and existing under the laws of Malaysia, with its principal place of business in Malaysia.

13   Ayu was the owner of the Vessel. The United States Coast Guard designated IMC and Ayu

14   as the Responsible Parties ("RPs") under the Oil Pollution Act of 1990 ("OPA") for the

15   Incident. IMC and Ayu are referred to herein as "RPs" or "Claimants."

16

17        7.      Defendant is the United States of America, acting by and through the United

18   States Coast Guard National Pollution Funds Center. The National Pollution Funds Center

19   ("NPFC") is a unit of the United States Coast Guard, which is an agency of the United

20   States under the Department of Homeland Security. The NPFC resides in the District of

21   Columbia.

22
23
24
25
26

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 4 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## JURISDICTION AND VENUE

8.   Claimants bring this action to review final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* This Court has federal question jurisdiction over this action as a civil action arising under the Constitution and laws of the United States, including the OPA, 33 U.S.C. §§ 2700-2762, pursuant to 28 U.S.C. § 1331, and under its admiralty jurisdiction pursuant to 33 U.S.C. § 1333.

9.   Venue in the United States District Court for the District of Columbia is proper pursuant to 33 U.S.C. § 2717(b) as the Defendant resides in this district. *See* 33 U.S.C. § 2717(b).

## NATURE OF ACTION

10.   This action seeks judicial review of a final informal administrative adjudication by the NPFC in which it improperly denied portions of a claim ("the Claim") brought by IMC and Ayu pursuant to the OPA, 33 U.S.C. §§ 2708 & 2713(b)(1)(b). In their Claim, the RPs sought reimbursement of costs and expenses they incurred while participating in a cooperative natural resource damages assessment ("NRDA") arising from the Incident. The NPFC's denial of reimbursement of some of those NRDA expenses was based on errors of law and fact, and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 5 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

**LEGAL BACKGROUND**

11.     Under the OPA, responsible parties are strictly liable for the cleanup costs and damages resulting from the discharge of oil from a vessel. 33 U.S.C. §2702(a). The OPA specifies the categories of damages for which it imposes liability on responsible parties. 33 U.S.C. §2702(b)(2)(A)-(F). One such category of damages is damage for injury to, destruction of, or loss of use of, natural resources, including the costs of assessing the damage. 33 U.S.C. §2702(b)(A).

12.     One of the NPFC's responsibilities is to administer the multi-billion dollar Oil Spill Liability Trust Fund ("the Fund" or "OSLTF") established in 1986. When an oil spill occurs on navigable waters, the Coast Guard can access the Fund to pay for its costs in responding to the spill. 33 U.S.C. § 2712(a)(1). Private parties, federal agencies, and state political entities can also submit claims against the Fund to recover damages or removal costs they have sustained or incurred.

13.     The OPA provides that, in some cases, the strict liability it imposes on responsible parties may be limited. 33 U.S.C. § 2704(a). The OPA limit of liability for a discharge of oil from a vessel is based on the gross tonnage of the vessel. 33 U.S.C. § 2704(b). The Fund may also be used to reimburse responsible parties who are entitled to limit their OPA liability, and who have incurred cleanup costs and damages, and settled third-party damages claims in an aggregate amount that exceeds the limit of their OPA liability. 33 U.S.C. §§ 2708 & 2713(b)(2). Thus, if the responsible party for an incident

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 6 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

1   successfully demonstrates that it is entitled to limit its OPA liability, it may assert a claim

2   against the Fund to recover the sum of the removal costs and damages it has incurred, plus

3   the amounts it has paid to settle OPA claims asserted against it, that exceeds the limit of its

4   OPA liability. 33 U.S.C. § 2708(b). The NPFC adjudicates such claims.

5

6   14.    Pursuant to the OPA, the NPFC has promulgated regulations governing the

7   presentation, filing, settlement, and adjudication of claims under OPA against the Fund.

8   33 U.S.C. 2713(e); 33 C.F.R. Part 136. But the NPFC has never promulgated regulations

9   that specifically apply to reimbursement claims by responsible parties, even though these

10  claims can total millions or tens of millions of dollars. The NPFC's regulations include

11  general provisions applicable to all claims. 33 C.F.R. §§ 136.1 – 136.115. The regulations

12  also specify the requirements for presenting claims for removal costs, 33 C.F.R. §§ 136.201

13  – 205, and for different categories of damages. 33 C.F.R. 136.207 – .241.

14

15  15.    Since the OPA's enactment, the NPFC has adjudicated claims by responsible

16  parties on a case-by-case basis. Its adjudications of such claims are documented in written

17  claim determinations. The NPFC has published written claim determinations decided after

18  2009    on    its    website.    https://www.uscg.mil/Mariners/National-Pollution-Funds-

19  Center/Claims/

20

21  16.    When adjudicating a claim for reimbursement by a responsible party seeking

22  to limit its OPA liability, the NPFC first determines whether the responsible party has

23  proven by a preponderance of the evidence that it is entitled to limit its OPA liability. If

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 7 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

the NPFC determines that a responsible party claimant is entitled to limit its OPA liability, it then reviews payments the responsible party has made for removal costs and damages to determine the extent to which those payments have exceeded the OPA limit of liability.

17.     The OPA provides that a responsible party's liability for natural resource damages shall be to the United States government, state governments, Indian tribes, or, in some cases, foreign governments for natural resources belonging to, managed by, controlled by, or appertaining to them. 33 U.S.C. §2706(a). These entities designate administrative agencies to act on behalf of the public as trustees for those natural resources. The Trustees are authorized to assess natural resource damages and develop and implement plans for the restoration, rehabilitation, replacement or acquisition of equivalent resources under their trusteeship. 33 U.S.C. § 2706(c).

18.     The OPA further directs the Under Secretary of Commerce for Oceans and Atmosphere to promulgate regulations for the assessment of natural resource damages under the OPA. In compliance with this directive, the National Oceanic and Atmospheric Administration ("NOAA") has adopted regulations governing the conduct of NRDAs under the OPA. *See* 15 C.F.R. Part 990.

19.     NOAA's NRDA regulations require the Trustees to invite the responsible party for an Incident to participate in the NRDA for the Incident. 15 C.F.R. § 990.14(c)(1). The nature and extent of a responsible party's participation in an NRDA is determined by

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 8 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

the Trustees. 15 C.F.R. § 990.14(c)(4). The Trustees have broad discretion in determining the nature and extent of a responsible party's participation in an NRDA.

## **RELEVANT FACTUAL BACKGROUND**

### *Determination By NPFC That RPs Were Entitled to Limit Their OPA Liability for the Incident.*

20.     The M/V SELENDANG AYU, a 738-foot bulk freighter, was traveling through the Aleutian Islands on December 6, 2004 when it experienced mechanical problems and encountered severe weather conditions. After floating without use of its engine for two days, the vessel ran aground off the shore of Unalaska, Alaska between Skan Bay and Spray Cape on December 8, 2004.

21.     The grounding ruptured the vessel's bottom fuel tanks and, ultimately, approximately 339,538 gallons of Intermediate Fuel Oil 380 and 14,680 gallons of marine diesel were released into the environment.

22.     The owner of the vessel, Ayu Navigation Sdn Bhd, and the operator, IMC Shipping Co. PTE. Ltd., were both designated as responsible parties ("RPs") for the spill. The RPs conducted and funded oil spill cleanup activities for the Incident.

23.     In December 2007, the RPs submitted a claim to the NPFC in which they asserted that they were entitled to limit their OPA liability to $23,853,000, pursuant to 33 U.S.C. § 2704. On January 27, 2012, the NPFC issued a determination in which it found that the RPs' were entitled to limit their OPA liability to $23,853,000.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 9 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

24.     After the NPFC issued its January 27, 2012 determination, the RPs submitted documentation regarding the amounts they had paid for the OPA removal costs and damages. The NPFC found that the RPs had incurred removal costs and paid damages that exceeded the limit of their OPA liability, and reimbursed the RPs the amounts it determined were reimbursable that exceeded the limit of the RPs liability.

25.     On August 17, 2012, the RPs submitted a claim to the NPFC for reimbursement of some of the NRDA costs they had incurred during the course of performing the natural resource damages assessment for the Incident. However, because the NRDA Trustees were still engaged in the NRDA, the NPFC advised the RPs that it could not adjudicate the RPs' claims for reimbursement of NRDA costs based on the then-available record. As a result, the RPs withdrew their claim for reimbursement of NRDA costs, without prejudice to their right to resubmit the claim in the future.

*The History of the RPs' Participation in the NRDA for the Incident.*

*1. The Preassessment Phase*

26.     When the Vessel grounded on December 8, 2004, it released oil along the western shoreline of Unalaska Island. Oil from the vessel was observed along approximately 86 miles of beach, rocky shore, and vegetated shoreline habitats. Subsequent studies documented exposure to oil and resulting injury to natural resources within these habitats.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 10 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

27.     The spill occurred in the wintertime in Alaska, along a remote and largely inaccessible coastline. No infrastructure, such as buildings, roads, airfields, utilities, or other facilities existed in the area impacted by the oil spill that could be used to support response operations. The only means of accessing the spill area to conduct cleanup operations and assess injuries to natural resources was by vessel or aircraft.

28.     The town of Dutch Harbor, Alaska is located on the northern coast of Unalaska, Island. The United States Coast Guard established an incident command center in Dutch Harbor, and Dutch Harbor served as the base of response operations for the Incident.

29.     The federal and state governments designated agencies to act as natural resource damages trustees ("Trustees") to assess damages and injuries to natural resources caused by exposure to oil discharged from the Vessel and by activities to respond to the discharge and cleanup of the oil.

30.     The NOAA's NRDA regulations recognize three phases of the NRDA process. The first phase of an NRDA is the "Preassessment Phase." NOAA's NRDA regulations addressing the Preassessment Phase are found at 15 C.F.R. §§ 990.40 – 990.45. The second phase of an NRDA under NOAA's regulations is the "Restoration Planning Phase." NOAA's NRDA regulations addressing the Restoration Planning Phase are found at 15 C.F.R. §§ 990.50 – 990.56. The third phase is the Restoration Implementation Phase.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 11 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

NOAA's NRDA regulations addressing the Restoration Implementation Phase are found at 15 C.F.R. §§ 990.60 – 990.66.

31.     NOAA's Preassessment Phase regulations provide a process that the Trustees may follow to determine if they have jurisdiction to pursue restoration under the OPA, and if so whether it is appropriate to do so. If the Trustees determine that they have jurisdiction to pursue restoration under the OPA, they must then determine whether injuries to natural resources under their trusteeship have resulted or are likely to result from the discharge, that response actions have not addressed or are unlikely to address those injuries, and that feasible restoration alternatives exist to address the potential injuries.

32.     NOAA's NRDA regulations authorize the Trustees to conduct data collection and analyses that are reasonably related to Preassessment Phase activities. Such data collection and analyses can be done to make the determinations of jurisdiction or to conduct restoration planning, to gather "ephemeral data" concerning injuries to resources, and to collect information needed to implement assessment procedures in later phases of the NRDA. In order to gather the necessary data, NRDA Trustees typically dispatch agency personnel and consultants to the area of an oil spill to observe and document information used to assess natural resource damages.

33.     If the Trustees determine that injuries to natural resources under their trusteeship have resulted from the discharge, that response actions have not addressed or are unlikely to address those injuries, and that feasible restoration alternatives exist to

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 12 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

address the potential injuries, then they are authorized under NOAA's regulations to proceed to the next phase of the NRDA, called the "Restoration Planning Phase." If the Trustees decide to proceed with restoration planning, they must open an administrative record to document the bases of their decisions.

34.    The Preassessment Phase of the SELENDANG AYU oil spill lasted from December 2004 through June 30, 2007. In attempting to reach the spill area to observe and document potential injuries to natural resources and to collect data and evidence relating to such impacts, the Trustees faced extreme challenges. As noted, the spill area in which natural resources were impacted was remote and uninhabited. Since the spill occurred in the winter, the area was subject to winter storms that frequent the Aleutian Islands, bringing high winds and seas, snow and ice.

35.    In order to reach the spill area, the Trustees decided to deploy the R/V TIGLAX, a government research vessel, to bring a team of Trustee personnel and expert consultants to the spill area in order to make initial observations, perform preliminary studies, and collect ephemeral data. However, it took several weeks for the TIGLAX and the scientists selected by the Trustees to mobilize to the spill area to conduct and perform these studies, data collection, and observations. Trustee personnel conducted studies and performed observations from the TIGLAX in late December 2004 and January 2005.

36.    In January 2005, the Trustees approached the RPs to request that they fund and provide trained personnel to conduct studies in the spill area relating to assessing

COMPLAINT TO VACATE AND SET ASIDE FINAL AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 13 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

seabird mortality caused by the Incident. The RPs agreed to fund the studies and subsequently provided funding, trained personnel and equipment to conduct the studies in February 2005, together with the Trustees.

37.     As the result of the Trustees initial studies and observations aboard the R/V TIGLAX in December 2004 and January 2005, they determined that they would need to conduct additional preassessment studies in the spill area during the spring and summer of 2005. The Trustees approached the RPs to ask whether they would fund, and assist in conducting, these preassessment studies and activities. With one exception, the RPs agreed to fund and participate in the Trustees' proposed studies. The RPs and the Trustees then jointly participated in the RPs-funded studies within the spill area.

38.     The RPs' subsequent participation in the Preassessment Phase of the NRDA was extensive. They chartered or purchased vessels, aircraft and equipment for use in the Preassessment Phase studies and activities, and hired technical personnel to participate in field surveys and studies, comment on study protocols and results, draft reports, and identify and evaluate potential restoration projects for natural resources adversely impacted by the Incident.

39.     On March 30, 2007, the Trustees published a Notice of Intent to Conduct Restoration Planning in the Federal Register (72 FR 15150). In the notice, the Trustees stated that they had determined that they had jurisdiction to enter into the Restoration Planning Phase of the NRDA, and that it was appropriate to do so. The notice generally

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 14 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

described the Preassessment Phase activities performed by the Trustees and noted that the RPs had cooperated in and funded some of those activities.

### 2. The Restoration Planning Phase

40.     NOAA's NRDA regulations provide that the Trustees are to determine the nature and extent of injuries to natural resources resulting from an incident, and identify and select restoration alternatives to restore injured natural resources and compensate the public for injuries to such resources. The Trustees evaluate and quantify injuries to natural resources during the Restoration Planning Phase of an NRDA. They then use that information to determine the need for and scale of restoration actions.

41.     NOAA's regulations thus require the Trustees to identify injuries to natural resources resulting from an incident and quantify those injuries during the Restoration Planning Phase. After identifying and quantifying such injuries, NOAA's regulations direct the Trustees to identify restoration alternatives that will restore injured resources and compensate the public for the damage to such resources. The regulations require the Trustees to determine the scale of restoration actions that are necessary to provide adequate restoration and compensation.

42.     In assessing potential restoration projects, the NOAA regulations require the Trustees to consider a reasonable range of restoration alternatives before selecting their preferred alternative(s). After identifying a range of restoration alternatives, NOAA regulations require the Trustees to evaluate the alternatives based on several criteria,

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 15 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

including the cost to carry out the alternative and the likelihood of success of each alternative.

43.     As the Trustees were preparing to enter the Restoration Planning Phase of the NRDA, they formally invited the RPs to participate in the NRDA. In anticipation of the RPs' participation in the Restoration and Planning Phase, the Trustees and the RPs negotiated and executed a Funding and Participation Agreement ("FPA"). The FPA was executed by the parties in April and May of 2007.

44.     In Section III.A. of the FPA the Parties acknowledged that cooperation between the Trustees and the RPs "to further determine injuries to natural resources and services, quantify such injuries, and develop, evaluate and select projects to restore, rehabilitate, or replace the equivalent of the injured resources may be cost-effective, avoid duplication of work, and effectively use limited personnel and other resources." It provided that such efforts would be referred to as "Cooperative Activities."

45.     Section III.B of the FPA provided that the Parties would develop scopes of work to briefly describe the Cooperative Activities that were to be performed pursuant to the FPA, and that such scopes of work would become attachments to the FPA and form a part of the agreement.

46.     Section IV.A of the FPA provided the Parties would cooperatively and collaboratively decide what data to collect, and the procedures for collecting it, for each Cooperative Activity.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 16 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

47.     Section IV.B of the FPA provided that the parties would exchange data and reports pertaining to Cooperative Activities. It further provided that all Parties would be provided with a proposed final draft report for a Cooperative Activity, and allowed a reasonable amount of time within which to review and comment on the document before it was issued in final form.

48.     Section IV.C of the FPA provided that the Trustees and the RPs would attempt to reach consensus on the interpretation of, and any conclusions to be drawn from, data collected or generated pursuant to a Cooperative Activity. When the Parties were unable to reach agreement, each party reserved the right to develop separate and independent findings and conclusions, which would be included in the Administrative Record for the NRDA.

49.     The FPA also provided that the RPs would reimburse the Trustees for the reasonable assessment costs incurred by the Trustees resulting from the Incident. The RPs agreed to provide advance funding in the amount of $135,000 to certain the Trustee agencies.

50.     The FPA also expressly provided that, upon the agreement of the Parties, the RPs could directly contract for goods or services as part of a Cooperative Activity, if the costs of those goods or services was anticipated to exceed $5,000, and the RPs could directly pay the provider of those goods or services accordingly.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 17 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

51.     On May 7, 2008 the Trustees identified five categories of activities they intended to perform during the Restoration Planning Phase. These included studies to assess the exposure of sea ducks to oil, studies to assess the presence and bioavailability of lingering oil within the spill area, studies to identify and evaluate restoration alternatives, and efforts to further assess the magnitude of the injuries to birds and other natural resources.

52.     On the same date, the Trustees proposed a broad, general scope of work pursuant to the FPA, encompassing these efforts: "Participate in technical meetings and gather information to identify, develop and evaluate alternatives for the restoration, rehabilitation, replacement or acquisition of the equivalent of the natural resources and services injured, destroyed or lost as a result of the discharge of oil into the environment in connection with the M/V SELENDANG AYU incident."

53.     Pursuant to this broad and general scope of work, the Trustees and the RPs cooperatively engaged in numerous cooperative activities studies during the Restoration Planning Phase, including seabird mortality modeling, assessing restoration alternatives, and studying whether residual oil remaining along inaccessible shorelines was continuing to cause injury to natural resources.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 18 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

1

### 3. Seabird Mortality Modelling

54.     As noted above, the NOAA NRDA regulations require the Trustees to assess and quantify the injuries to natural resources, and to scale restoration projects to provide restoration and compensation for such injuries.

55.     From the time of the spill in 2004 through 2005, the Trustees collected the carcasses of 1,795 oiled seabirds that had washed up on the shorelines within the spill area. The vast majority of the carcasses recovered were auklets. Of the auklet carcasses that could be further identified, most were identified as belonging the crested auklets species.

56.     Because the Trustees had been unable to access most of the spill area to search for and recover seabird carcasses until weeks after the vessel grounded and spilled oil, and because the spill area extended over 86 miles of shoreline, the Trustees believed that they had only recovered carcasses from a small percentage of the seabirds oiled and killed by the Incident. They believed that many of the carcasses that would have been found along the shorelines immediately after the Incident had been removed from the shorelines by tidal action and by scavengers such as foxes, eagles and gulls.

57.     In prior oil spills, a model called the "beached bird model (BBM)" had been developed to estimate seabird mortality, based on the number of seabird carcasses recovered from shorelines in the spill area in the days and weeks following the spill. But the BBM had been developed for use in spill incidents in which response personnel were

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 19 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

able to mobilize quickly to the impacted shorelines to quantify oiled and dead seabirds along those shorelines.

58.     One of the Cooperative Activities in which the RPs and the Trustees engaged during the Restoration Planning Phase was to assess whether the BBM could be used to develop a reliable estimate of seabird mortality for the Incident, given the lack of data on the number and types of oiled seabird carcasses along long stretches of shorelines in the first several weeks after the grounding of the Vessel. This lack of data presented substantial challenges to the use of the BBM.

59.     It became apparent that the BBM could not be used without making numerous assumptions and extrapolations from those assumptions to replace the missing data. The Trustees and the RPs' technical representatives met numerous times over a period of several years to attempt to reach an agreement on a set of assumptions that could be used to run the model. During this process, the Trustees provided the RPs with a copy of the BBM so that their consultants could run their own model simulations using different sets of assumptions.

### 4. Cooperative Efforts to Identify and Assess a Range of Restoration Alternatives

60.     As noted above, NOAA's NRDA regulations require the Trustees to identify and evaluate potential restoration projects to restore and compensate the public for injuries to natural resources. One potential restoration project identified by the Trustees to benefit crested auklets was to kill invasive rats on Kiska Island. Kiska Island is an uninhabited

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 20 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

island near the western end of the Aleutian Island chain. It is a designated wilderness area within the Alaska Maritime National Wildlife Refuge. It encompasses an area of approximately 108 square miles.

61.    A large crested auklet colony is present in a volcanic rock flow at Sirius Point on Kiska Island. Crested auklets nest underground in crevices and cavities between rocks. The Trustees believed that the rats on Kiska Island feed on crested auklet chicks and eggs. If rat predation on crested auklet chicks and eggs is significant, then eradicating the rats living on Kiska Island would benefit crested auklets.

62.    In the fall of 2008, the U.S. Fish & Wildlife Service conducted a rat eradication project on Hawadax Island (then known as "Rat Island"), an island in the Aleutian Island chain. Hawadax Island encompasses an area of approximately 10.8 square miles (one-tenth the size of Kiska Island). The U.S. Fish & Wildlife Service hired a contractor, which used two helicopters to spray rat poison across the entire extent of Hawadax Island. It took ten days to distribute rat poison across Hawadax Island. The project, which cost over $3.2 million, succeeded in killing all of the invasive rats on the island. But it also killed at least 46 bald eagles and hundreds of seabirds, whose poisoned carcasses were discovered the next year when U.S. Fish & Wildlife researchers returned to the island.

63.    The RPs' consultants and the Trustees met in January 2009 to discuss the Trustees' proposal to conduct rat eradication on Kiska Island. The RPs' consultants noted

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 21 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

that there was little evidence that rat predation on crested auklet eggs and chicks was significant on Kiska Island, and thus no evidence that killing the rats would benefit crested auklets. Second, they noted that Kiska Island is ten times larger than Hawadax Island, and a rat eradication project of the scale required to eradicate rats on Kiska Island had not been previously attempted. They noted that if it took two helicopters ten days to complete the rat eradication project on Hawadax Island in ideal weather conditions, it would take 100 days for two helicopters to do so in perfect weather conditions on Kiska Island. Even if the Trustees used five helicopters, it would take at least one month to cover the island with rat poison. Third, rats are also present on Little Kiska Island, a three-square mile island which is close enough to Kiska Island that rats can swim between them. Thus, to permanently eradicate rats on Kiska Island, rats would also have to be eliminated on Little Kiska Island. Fourth, Kiska was invaded by Japanese armed forces in World War II and the occupying forces built a series of tunnels and bunkers on the island, in which rats could potentially be present. The RPs' consultants were concerned that dropping rat poison on the island from helicopters would not kill rats living in the tunnels and bunkers. They also expressed concern that rats might also live in tunnels beneath the year-round snow on Kiska Island's volcano peak. If so, those rats would not be exposed to rat poison dropped from helicopters. If the project did not succeed in killing all of the rats, they would quickly replicate and repopulate the island.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 22 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

64.     An additional concern raised by the RPs was that such a project would have to be attempted in the fall, after the seabirds, including auklets, that nest on the island during the summer had departed. Otherwise, the project would end up spreading the poison across areas in which the seabirds and their chicks were nesting, killing the very birds the project was intended to benefit. For that reason, the rat eradication project on Hawadax Island occurred in the month of October.

65.     The weather in the Bering Sea and the Aleutian Islands is typically poor in October, which is the beginning of the winter storm season. NOAA's U.S. Coast Pilot describes the weather in the Aleutian Islands between October and March as follows: "The Aleutian Low looms over the North Pacific as a climatic warning to mariners navigating the Alaskan waters. This semi-permanent feature is made up of the day-to-day storms that traverse these seas in a seemingly endless procession. With these storms come the rain, sleet, snow, the howling winds and the mountainous seas that make the northern Gulf of Alaska and the southern Bering Sea among the most treacherous winter waters in the Northern Hemisphere."

66.     As noted, the U.S. Fish & Wildlife Service project to kill the rats on Hawadax Island took 10 days to complete in perfect weather conditions. That such a project could be successfully completed on the much larger and more remote Kiska Island beginning in October seemed a very questionable assumption to the RPs' consultants.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 23 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

67.     Spreading poison across the entire surface of Hawadax Island had killed dozens of bald eagles and hundreds of seabirds. Because the combined area of Kiska Island and Little Kiska Islands is more than ten times greater than that of Hawadax Island, the RPs' consultants were concerned spraying rat poison across the surfaces of those islands would likely end up killing thousands of seabirds and eagles.

68.     In March of 2009, the Trustees invited the RPs to meet to discuss the willingness of the RPs to fund and participate in a feasibility study of rat eradication on Kiska Island. At the same time, they invited the RPs to inform them of any other potential restoration projects the RPs thought worth considering for crested auklets. In April 2009, the Trustees again asked the RPs if they were aware of any potential viable restoration projects for crested auklets, other than rat eradication.

69.     In response to the Trustees' inquiries, the RPs retained and consulted with several seabird biologists who had performed research on auklet colonies in Alaska, to attempt to further evaluate whether a rat eradication project on Kiska and Little Kiska Islands was feasible and would benefit crested auklets, and to identify other potential restoration projects that might benefit crested auklets.

70.     The auklet biologists retained by the RPs noted that in the Aleutian Islands, auklet nesting habitat is created when volcanic explosions result in fields of fresh lava rocks. Auklet colonies of as many as one million birds have been observed nesting within crevices and cavities in such rock formations in the decades after such volcanic events

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 24 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

when the rock fields are barren. But over decades, encroaching vegetation begins to grow over the rocks. Eventually, the encroaching vegetation blocks access to the nesting areas within the rock formations.

71.    As nesting sites are lost to encroaching vegetation, the size of the colony becomes limited by the availability of nesting sites, and many auklets are unable to lay eggs due to the lack of nesting sites. Nesting site availability thus limits the size of the auklet colony as breeding age auklets are unable to find a nesting site and are thus unable to successfully produce auklet chicks. As a consequence, the size of the auklet colonies has been observed to dramatically decrease over decades, as vegetation grows over the rocks blocking access to auklet nest sites.

72.    The RPs' consultants believed that removal of vegetation encroaching on existing auklet colonies in Alaska was a feasible restoration project that would increase the availability of nest sites, thus increasing the production of auklets from auklet colonies to the benefit of auklet populations.

73.    In late April 2009, an auklet biologist retained by the RPs prepared a proposal for a multiyear study to evaluate whether the removal of vegetation encroaching on a crested auklet colony nesting area on Gareloi Island, Alaska would increase the production of auklet chicks from that colony. Another auklet biologist retained by the RPs proposed assessing the feasibility of a vegetation removal study on St. Lawrence Island in the northern Bering Sea.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 25 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

74.     On May 14, 2009 the Trustees met with the RPs' representatives and their retained auklet biologists to discuss potential restoration projects for crested auklets, including rat eradication on Kiska Island and the removal of encroaching vegetation ("habitat manipulation") on Gareloi and St. Lawrence Islands. At the May 14 meeting, Dr. Ian Jones and Dr. Hector Douglas, both auklet biologists, made presentations to the Trustees regarding proposed multiyear projects to assess whether removing encroaching vegetation from auklet breeding colonies was a suitable restoration project for crested auklets. After discussing the projects with the RPs' consultants and auklet biologists, the Trustees endorsed the proposed field studies and assessments related to habitat manipulation studies on Gareloi Island and St. Lawrence Island during the summer of 2009. The Trustees subsequently confirmed their desire to participate in the habitat manipulation studies, and to treat them as cooperative studies under the FPA, in a July 2, 2009 email to the RPs. The studies were funded by the RPs but were performed by Dr. Douglas and Dr. Jones, using protocols approved by the Trustees.

75.     In October 2009, the RPs and the Trustees met to discuss the results of the studies performed on Gareloi and St. Lawrence Island during the summer of 2009, the initial observations and data collected, and the plan to return to Gareloi Island in 2010 to continue the study there.

76.     Dr. Jones developed a study protocol for the work to be performed on Gareloi Island in 2010. On April 19, 2010, the Trustees, Dr. Jones and the RPs consultants held a

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 26 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

telephonic meeting to discuss the protocol for the 2010 study. After all parties reached agreement on the study protocol, Dr. Jones' team returned to Gareloi Island in the summer of 2010 to continue studying whether vegetation removal would be a viable restoration project.

77.     On March 30, 2011, the RPs and the Trustees participated in a conference call to discuss the results of the 2010 fieldwork on Gareloi Island and the protocol for continuing the study during the summer of 2011. On April 16, 2011 the Trustees provided comments on the proposed study plan for the 2011 fieldwork. The RPs responded to the Trustees' April 16, 2011 comments on May 27, 2011. After reaching agreement on the study protocol, Dr. Jones' team returned to Gareloi Island in the summer of 2010 to continue studying whether vegetation removal would be a viable restoration project.

78.     Because Gareloi Island is a remote, uninhabited island in the Aleutian Islands chain, the RPs had to charter vessels, purchase equipment and supplies, and hire field workers in each of those years to perform these studies. The RPs incurred a total of $3,088,898.39 to fund the vegetation removal studies.

79.     The RP's consultants concluded that a vegetation removal project would be far less expensive than the cost of rat eradication on Kiska Island, would have a greater chance of success, and would provide more benefits to auklets than would a rat eradication project.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 27 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

80.     The RPs incurred $76,630 in fees and costs for their consultants to review and assess the feasibility of conducting a rat eradication project on Kiska and Little Kiska Islands.

*5. The Lingering Oil Study*

81.     Another cooperative project performed by the RPs and the Trustees during the Restoration Planning Phase was an assessment of whether unrecovered oil in the spill area was bioavailable to natural resources. The RPs and Trustee personnel examined selected shorelines within the spill area and collected samples of sediments and mussels so they could be tested in a laboratory for the presence of elevated levels of hydrocarbons. They referred to this study as the "Lingering Oil" study.

82.     The Trustees provided the RPs with their proposed protocol for conducting the Lingering Oil study, and requested the RPs' comments on the study. The RPs retained an expert in oil chemistry to comment on the study protocol and provided those comments to the Trustees in the spring of 2008.

83.     In June of 2010, the Trustees sent the RPs a draft report regarding the Lingering Oil Study. The draft report included data from a laboratory used by the Trustees to analyze sediment and tissue samples for the presence of hydrocarbons. The Trustees specifically requested that the RPs provide feedback regarding the draft report. Because the draft report concerned oil chemistry, the RPs again consulted with an oil chemist, who

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 28 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

reviewed the Trustees' draft report and provided substantive comments and feedback to the Trustees regarding the draft report.

84.    The RPs incurred $126,179.75 in fees from their technical consultants to review and comment on the Trustees' study protocol and draft report for the Lingering Oil Study.

### 6. The NPFC's Adjudication of the RPs' Claim for Reimbursement of NRDA Costs

85.    After the NPFC determined that the RPs were entitled to limit their OPA liability in January 2012, the Trustees and the RPs modified their relationship. The RPs notified the Trustees that they no longer intended to fund all of the NRDA activities and would reduce their participation in the NRDA. As a consequence of this development, the Trustees pursued funding to complete the NRDA from the NPFC.

86.    The NPFC notified the Trustees that before they could obtain funding from the Fund to complete the NRDA they needed to develop an Assessment Plan, in which they described the history of the NRDA to date and explained the Trustees' plan for completing the NRDA.

87.    In early 2016, the RPs and the Trustees executed Amendment Number 1 to the FPA. In Section II of Amendment No. 1, the Trustees acknowledged that the RPs had cooperated with the Trustees in their NRDA, noting that "Cooperative Activities have included funding studies to assess the nature and extent of natural resource injuries and to

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 29 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

identify and assess the feasibility, cost and potential benefits of restoration projects to compensate the public for harm to natural resources resulting from the Incident."

88.    The Trustees and the RPs attached, as Exhibit 2 to Amendment Number 1 of the FPA a list of Cooperative Activities undertaken by the Parties during the course of the NRDA. Among the Cooperative Activities identified in Exhibit 2 were activities related to assessing seabird mortality resulting from the Incident.

89.    Exhibit 2 to Amendment Number 1 of the FPA also identified the Parties' efforts to identify restoration alternatives as a cooperative activity that had been undertaken under the FPA. It specifically identified the vegetation removal study project as one of the cooperative activities undertaken to identify restoration alternatives.

90.    The NRDA Trustees subsequently published, in October 2016, a Natural Resource Damage Assessment Plan for the M/V SELENDANG AYU Oil Spill, in which the Trustees described the history of the NRDA to that point in time, and the steps that the Trustees believed would be necessary to complete the NRDA process.

91.    The NRDA Trustees also submitted, in 2016, a claim to the NPFC for reimbursement of past unreimbursed NRDA costs and for funding to allow the Trustees to complete their assessment of potential injuries to natural resources resulting from the Incident. In September 2017, the NPFC determined that it would pay the NRDA Trustees $3,699,059.47. The determination reimbursed the Trustees for $1,236,943.47 for past unreimbursed assessment costs and authorized the additional expenditure of $2,462,116

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 30 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

for future assessment and restoration planning activities. In November 2018, the RPs resubmitted to the NPFC their claim for reimbursement of NRDA costs that they had incurred in response to the Incident ("the Claim"). They sought reimbursement of $11,373,659.63 from the NPFC for NRDA costs they had incurred. The RPs later increased the amount of their claim to $11,391,721.26.

92.      In their claim, the RPs sought reimbursement of $5,127,535.97 in payments made to reimburse the Trustees for assessment costs the Trustees had incurred in conducting the NRDA. The RPs also sought reimbursement from the NPFC of $6,264,185.29 in assessment costs that they had incurred directly during the NRDA.

### 7. NPFC Improperly Denies RPs Claim

93.      On August 2, 2019, more than eight months after it had received the Claim, the NPFC sent a letter to the RPs' legal counsel regarding the Claim. In its August 2 letter, the NPFC acknowledged that the Trustees and the RPs had engaged in Cooperative Activities during the NRDA.

94.      In the letter, the NPFC asserted the legal opinion that under the OPA, the RPs had no legal authority to directly incur NRDA assessment costs, or to recover such directly incurred costs from the NPFC (referred to as the "Original New Legal Opinion"). It requested that the RPs advise the NPFC how the RPs wished to proceed with the adjudication of the $6,264,185.29 of costs the RPs had directly incurred during the NRDA. The letter advised the RPs that if the NPFC did not receive a response from the RPs, it

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 31 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

would proceed with adjudication of the portion of the Claim seeking reimbursement of $5,127,535.97 in assessment costs that the RPs had paid to reimburse the Trustees but would not proceed with adjudicating that portion of the Claim seeking reimbursement of the RPs' directly-incurred assessment costs.

95.    On August 23, 2019 the RPs' legal counsel wrote a letter to the NPFC in which the RPs challenged the Original New Legal Opinion. The RPs noted that the Original New Legal Opinion was inconsistent with the language of the OPA, the goals Congress sought to achieve when enacting the OPA, NOAA's NRDA regulations, and prior claim determinations of the NPFC in which it had reimbursed responsible parties for NRDA costs that the responsible parties had directly incurred. It noted that the Original New Legal Opinion had never before been articulated by the NPFC or applied by it when adjudicating prior claims during the 30 years since the OPA's enactment.

96.    On December 20, 2019 the RPs' counsel sent a second letter to the NPFC addressing the Original New Legal Opinion. The December 20, 2019 letter presented documentation from two prior claim determinations in which the NPFC had reimbursed a responsible party for NRDA costs that it had directly incurred. The letter noted that the Original New Legal Opinion was inconsistent with these prior claim determinations, and that the NPFC was essentially proposing to change the legal rules governing a responsible party's right to reimbursement of NRDA costs, after they had been incurred in reliance on past NPFC decisions, in the midst of adjudicating the Claim.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 32 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

97.     On January 16, 2020, the NPFC issued a claim determination in an unrelated reimbursement claim ("the POWHATAN Claim") by a responsible party for a small tug which sank and released a small amount of diesel oil. The responsible party for the POWHATAN Claim had sought reimbursement of $19,080.25 in costs it had incurred in responding to an NRDA initiated by trustees in response to that incident. The responsible party for the POWHATAN Claim had declined to enter into a cooperative NRDA with the trustees, and none of its claimed NRDA costs were incurred to fund cooperative NRDA activities.

98.     In denying the POWHATAN responsible party's claim for reimbursement of its NRDA costs, the NPFC articulated yet another new legal standard for reimbursing a responsible party for NRDA costs that it directly incurs. While the NPFC continued to assert that a responsible party does not have the authority to incur NRDA costs independently, it concluded that "under some circumstances, if an RP evidences that it incurred costs at the explicit direction of a trustee and on behalf of the trustee for activities determined by the trustee to be necessary to support the trustee-led NRDA, then those RP costs may be reimbursed by the NPFC as OPA-compensable natural resource damages with respect to a limit of liability claim. Stated another way, these are costs that would have been incurred by the Trustee for NRDA activities **and** the trustee authorized that the RP could fund those activities directly." The standard set forth in the NPFC's January 16, 2020

COMPLAINT TO VACATE AND SET ASIDE FINAL AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 33 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

determination of the POWHATAN claim is referred to as the "Second New Legal Standard" in this Complaint.

99.     On February 21, 2020, the NPFC advised the RPs that it was no longer using the Original New Legal Opinion but that the NPFC intended to apply the Second New Legal Standard to the RPs' Claim. Despite changing the new standard the NPFC was applying, the NPFC came to the exact same conclusion. In short, the NPFC was in search of a legal opinion to support its decision to deny reimbursement rather than impartially applying the correct legal standard to determine if reimbursement was required.

100.     The RPs had incurred NRDA costs from December 2004 through 2016. The NPFC did not articulate the Second New Legal Standard until January 2020, many years after RPs had stopped incurring NRDA costs, and more than 15 years after RPs began incurring such costs. In short, the NPFC applied a standard for reimbursement that did not exist when the RPs incurred the disputed NRDA costs, and that the RPs had no way to know would be adopted at the time the costs were incurred.

101.     On May 21, 2020 the RPs submitted a letter to the NPFC in which they argued that the Second New Legal Standard was legally erroneous in that it was inconsistent with the OPA's plain language and NOAA's NRDA regulations. The RPs also noted the unfairness resulting from the NPFC changing the rules governing their Claim while in the midst of adjudicating it, and years after the RPs had already incurred the NRDA costs. They pointed out that the NPFC had adopted the Second New Legal Standard

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 34 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

after having over a year to study the claims documentation that the RPs had submitted in support of their claim in November 2018, and was creating a new requirement for documentation that the NPFC knew did not exist in the record, in order to support a decision to deny reimbursement to the RPs of many of their NRDA costs.

102.   In their May 21, 2020 submission, the RPs also submitted additional documentation that demonstrated that the NRDA costs that the RPs had directly incurred during the cooperative NRDA for the SELENDANG AYU incident had been incurred to fund activities that the Trustees had requested or invited the RPs to conduct, or that the Trustees had agreed should be conducted with the understanding that the RPs would directly fund the project or activity.

103.   On April 8, 2022 the NPFC issued an initial determination of the RPs' claim for reimbursement of NRDA costs. It offered to settle the claim for $7,218,149.91. The offer included reimbursement of $5,113,673.03 in payments by the RPs to reimburse the Trustees for their NRDA costs. The offer also included reimbursement of $662,786.30 of NRDA costs that the RPs had directly incurred during the Preassessment Phase, and $1,441,690.58 of NRDA costs that the RPs had directly incurred during the Restoration Planning Phase.

104.   The NPFC's April 8, 2022 determination denied reimbursement to the RPs of $153,682.17 that the RPs had incurred directly during the Preassessment Phase, and $4,006,026.24 in NRDA costs that the RPs had incurred directly during the Restoration

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 35 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

Planning Phase. Thus, the NPFC's April 8, 2022 determination denied a total of $4,159,708.41 of claimed NRDA costs that the RPs had directly incurred during the SELENDANG AYU NRDA.

105.   In denying reimbursement of many of the RPs' directly-incurred NRDA costs, the NPFC applied the Second New Legal Standard that it first articulated in January 2020. In its determination of the Claim, the NPFC acknowledged that it had not adopted this new legal standard until long after the RPs had directly incurred the NRDA costs for which they sought reimbursement, and long after they had submitted the Claim. It also acknowledged that the RPs and the NPFC had discussed the standard of proof applicable to a responsible party's claim for reimbursement of NRDA costs as early as 2005, and that those discussions had been guided by earlier NPFC adjudications of a responsible party's claims for reimbursement of NRDA costs. In addition, the NPFC acknowledged the prejudice to the RPs caused by its having adopted the Second New Legal Standard long after the RPs' involvement in the NRDA had been terminated.

106.   On May 6, 2022 the RPs submitted a request for reconsideration of $3,867,043.06 in NRDA costs that the NPFC had denied in their initial claim determination. These included $3,088,898.39 in costs that the RPs incurred to fund the vegetation manipulation studies between 2009 and 2012, $76,630 in costs to evaluate whether a rat eradication project on Kiska Island was a suitable restoration project, $127,573 in costs incurred by the RPs in connection with the Lingering Oil Study, and

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 36 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

$532,396 in direct costs incurred by the RPs to work with the Trustees to develop a reliable estimate of seabird mortality

107.    On August 5, 2022 the NPFC denied the RPs' reconsideration request in its entirety, and again offered to pay $7,218,149.91 to settle the RPs' claim relating to NRDA costs. It justified its denial by relying on and retroactively applying the Second New Legal Standard. The NPFC's August 5, 2022 determination noted that its decision and offer constituted final agency action.

108.    In its April 8, 2022 claim determination and its August 5, 2022 denial of the RPs' reconsideration request, the NPFC denied all of the costs that the RPs had incurred in assessing the feasibility of a project to eradicate the invasive rats on Kiska Island as a restoration project to benefit crested auklets. Despite the fact that the Trustees specifically asked the RPs to participate in efforts to evaluate and assess the feasibility of the project, the NPFC determined that the costs incurred by the RPs in assessing the rat eradication project's feasibility were for activities that the Trustees had not specifically requested the RPs to perform. The NPFC made this determination even though the administrative record clearly documents that the Trustees requested the RPs consider participating in evaluating the feasibility of such a project, and invited the RPs' consultants to attend meetings to discuss the feasibility of the project.

109.    The NPFC also denied all of the costs that the RPs had incurred relating to assessing whether removing encroaching vegetation from auklet breeding colony habitat

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 37 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

was a viable restoration alternative. It based its decision to deny reimbursement of any of these costs on its determination that the study was first proposed by the RPs, and that there was no evidence that the Trustees would have performed the study if the RPs had not proposed it and agreed to fund it. It made this determination despite the fact that the Trustees specifically asked the RPs to identify potential restoration projects for auklets, which prompted the RPs to consult with auklet biologists to identify potential projects, which in turn resulted in those auklet biologists proposing the vegetation removal projects as potentially viable restoration alternatives. It was auklet biologists who recommended to the RPs and to the Trustees that they evaluate the feasibility of a vegetation removal project. After meeting with these biologists, the Trustees specifically and expressly agreed that such a study was worthwhile and agreed that the RPs should fund the project as a cooperative activity under the FPA. The Trustees participated in the development of study protocols and in the interpretation of study results, and met with the RPs' technical consultants several times to discuss the study and its results. Despite this documented history, the NPFC found that there was nothing in the record that indicated that the project was conducted at the request or direction of the Trustees, nor any indication that the Trustees would have pursued the project on their own initiative. The NPFC inaccurately claimed that the Trustees had previously identified rat eradication on Kiska Island as their preferred alternative, were skeptical about the vegetation removal study, and only agreed to cooperate in the study in order to obtain the RPs funding for a feasibility study regarding

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 38 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

rat eradication. These factual findings were inaccurate and unsupported in the administrative record for the Claim.

110.   The NPFC also denied reimbursement to the RPs of costs they incurred for their consultants to review and comment on a draft report prepared by the Trustees concerning the Lingering Oil Study. It based its denial of these costs on its erroneous assertion that the draft report was a final report, and that the Trustees had not requested the RPs' comments on the report. In doing so, the NPFC ignored the specific provisions in the FPA that provided that each party would be provided an opportunity to review and comment on study data and draft reports. It also overlooked communications between the RPs and the Trustees in which the Trustees specifically requested that the RPs provide written comments regarding the Lingering Oil Study draft report.

111.   The NPFC also denied reimbursement to the RPs of costs they incurred in working with the Trustees to attempt to develop a reliable estimate of seabird mortality. It accurately noted that the Trustees had declined to participate in studies performed by the RPs in 2010. But based on the fact that the Trustees declined to participate in that study, the NPFC denied almost all of the other costs incurred by the RPs in working cooperatively with the Trustees to attempt to develop an accurate estimate of seabird mortality. In doing so the NPFC overlooked the abundant evidence in the administrative record that the Trustees actively solicited the RPs' involvement in attempting to develop an accurate record of seabird mortality, and that many of the costs incurred by the RPs were for their

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 39 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

consultants to develop estimates of seabird mortality and to meet with the Trustees to discuss how to best overcome the significant challenges to developing an accurate and reliable estimate.

112.    The denial of reimbursement of the costs directly-incurred by the RPs while participating in cooperative efforts to assess the feasibility of the rat eradication project, vegetation removal project, lingering oil study, and the development of a model to estimate bird mortality was unreasonable, arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law.

## **FIRST CAUSE OF ACTION**

113.    Plaintiffs incorporate by reference the preceding paragraphs in this Complaint as if set forth at length herein.

114.    The August 5, 2022 denial by the NPFC of the RPs' request for reconsideration constitutes final agency action with respect to the Claim and the Plaintiffs have exhausted their administrative remedies.

115.    The Second New Legal Standard adopted by the NPFC for the reimbursement of NRDA costs directly incurred by a responsible party in a cooperative NRDA was based on an erroneous interpretation of the OPA and NOAA's regulations governing the conduct of NRDAs.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 40 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

116. The NPFC applied this erroneous Second New Legal Standard to wrongfully deny reimbursement of $3,867,043.06 to the RPs for NRDA costs that they directly incurred.

117. The denial of reimbursement of these NRDA costs based on this incorrect Second New Legal Standard should be set aside as being unreasonable, arbitrary, capricious, an abuse of discretion, contrary to the OPA and its associated regulations, and otherwise not in accordance with the law.

## SECOND CAUSE OF ACTION

118. Plaintiffs incorporate by reference the preceding paragraphs in this Complaint as if set forth at length herein.

119. The January 16, 2020 determination of the POWHATAN Claim was the first time the NPFC articulated and applied the Second New Legal Standard when adjudicating an RP's claim for reimbursement of NRDA costs. The Second New Legal Standard is inconsistent with the legal standard applied by the NPFC when it adjudicated prior claims for reimbursement of NRDA costs by RPs.

120. The Second New Legal Standard is not set forth in any of the claims regulations promulgated by the NPFC.

121. The NRDA Trustees developed a series of cooperative agreements with the RPs, under which the Trustees and the RPs operated while participating in the cooperative NRDA. The NPFC's Second New Legal Standard disregarded NOAA's NRDA regulations

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 41 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

and the cooperative agreements governing the manner in which the Trustees and the RP would conduct the NRDA, and impermissibly imposed retroactive requirements regarding the manner in which the RPs and the Trustees were required to document their agreements relating to the conduct of the cooperative NRDA in order for the RP to obtain reimbursement of such costs from the NPFC.

122.    Prior to its determination of the POWHATAN Claim, the NPFC had adjudicated at least two claims of responsible parties for reimbursement of NRDA costs that the responsible parties had incurred while participating in cooperative NRDAs. One of these claims was submitted by responsible parties for an oil spill from the tanker JULIE N. The other was submitted by the responsible parties for the cargo vessel KUROSHIMA.

123.    In its determination of the claims of the KUROSHIMA's responsible parties and the JULIE N's responsible parties, the NPFC agreed to reimburse the claimants for NRDA costs that they had incurred directly. The NPFC did not articulate or apply, as a condition of reimbursement of NRDA costs in these prior claims determinations, that the claimant was required to prove that it incurred costs "at the explicit direction of a trustee and on behalf of the trustee for activities determined by the trustee to be necessary to support the trustee-led NRDA."

124.    The NPFC adjudication of the claim for reimbursement of NRDA costs by the responsible parties for the JULIE N was finalized in 2002. In its 2002 determination, the NPFC agreed to reimburse the responsible parties $1,316,680.79 in NRDA assessment

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 42 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

costs, which was the amount claimed by the responsible parties. In other words, the NPFC did not deny reimbursement of *any* of the NRDA assessment costs claimed by the JULIE N's responsible parties. The assessment costs that the NPFC reimbursed to the JULIE N responsible parties included the fees paid directly by the responsible parties to its technical experts and consultants who participated in the cooperative NRDA. The NPFC's review of the assessment costs claimed by the responsible parties was focused on whether the costs were reasonable, and whether they were duplicative of costs incurred by the Trustees.

125.    The NPFC adjudication of the claim for reimbursement of NRDA costs by the responsible parties for the KUROSHIMA was finalized in 2006. Nowhere in the 2006 determination of the KUROSHIMA claim did the NPFC say that that the responsible parties must prove that it incurred NRDA costs at the explicit direction of a trustee and on behalf of the trustee for activities determined by the trustee to be necessary to support the trustee-led NRDA. In its 2006 determination of the KUROSHIMA claim, the NPFC stated that it would not reimburse NRDA costs for which the primary purpose was protecting the responsible parties' litigation interests. It declined to reimburse some of the NRDA costs claimed by the responsible parties on that basis.

126.    The NPFC's determinations of the responsible parties' claims for reimbursement of NRDA costs in the JULIE N and KUROSHIMA matters were decided before the RPs for the SELENDANG AYU funded cooperative activities during the Restoration Planning Phase, such as assessing the feasibility of rat eradication, assessing

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 43 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

the feasibility of vegetation removal from auklet colonies as a restoration project, estimating seabird mortality, and the lingering oil study.

127.    Before the RPs for the SELENDANG AYU negotiated and executed the FPA and agreed to fund cooperative activities during the Restoration Planning Phase of the NRDA, their counsel communicated with NPFC representatives regarding the documentation that the NPFC would require to reimburse the RPs for NRDA costs, should the RPs later be determined to be entitled to limit their OPA liability. In those communications, the NPFC never told the RPs that in order to obtain reimbursement of NRDA costs that they incurred directly, they would need to submit documentation to prove that the RPs incurred such costs at the explicit direction of a trustee and on behalf of the trustee for activities determined by the trustee to be necessary to support the trustee-led NRDA.

128.    If the NPFC had articulated the Second New Legal Standard in its prior claims determinations or in its communications with the SELENDANG AYU RPs, the RPs would have required, as a condition of funding the activities during the Restoration Planning Phase, that the Trustees provide appropriate written documentation sufficient to satisfy this requirement.

129.    By the time the NPFC adopted the Second New Legal Standard in January 2020, the RPs participation in the SELENDANG AYU NRDA was long over, and the

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 44 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

NRDA costs for which the RPs sought reimbursement in the Claim had been incurred many years prior.

130.    The NPFC received the RPs' claim for reimbursement of their NRDA costs, including backup documentation supporting the claim, in November 2018. Its claims staff reviewed the claim and was very familiar with the documentation supporting the RPs' claim, including the RPs' communications with the Trustees, before the NPFC adopted the Second New Legal Standard in January 2020.

131.    Even if one assumes *arguendo* that the Second New Legal Standard is based on a reasonable interpretation of the OPA, the retroactive application by the NPFC of the Second New Legal Standard to the Claim that was submitted more than a year before the adoption of the Second New Legal Standard, was unreasonable and fundamentally unfair.

132.    The retroactive application of the Second New Legal Standard to justify the denial of reimbursement of the RPs' directly-incurred NRDA costs should be set aside as being unreasonable, arbitrary, capricious, an abuse of discretion, contrary to the OPA and its associated regulations, contrary to NOAA's regulations governing the conduct of NRDAs, and otherwise not in accordance with the law or the Constitution's Due Process Clause.

## THIRD CAUSE OF ACTION

133.    Plaintiffs incorporate by reference the preceding paragraphs in this Complaint as if set forth at length herein.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 45 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

134.    Even if one assumes *arguendo* that the Second New Legal Standard adopted by the NPFC in January 2020 was reasonable and could be applied retroactively, the NPFC erroneously denied reimbursement of NRDA costs directly incurred by the RPs that were reimbursable under the Second New Legal Standard. The NPFC's denial of those costs directly was based on factual findings not supported by the record, blatant errors and faulty logic; relied upon insufficient evidence; was speculative; misinterpreted and misconstrued information; relied upon incorrect assumptions; used incorrect methodology or reasoning; and outright ignored contrary evidence provided by the RPs.

135.    By way of example and without limitation, the NPFC determined that the Trustees had not requested that the RPs provide to the Trustees analyses and reports concerning cooperative studies undertaken jointly by the RPs and the Trustees, despite clear evidence in the record that the Trustees had expressly requested that the RPs provide such analyses and reports to the Trustees.

136.    By way of further example and without limitation, the NPFC refused to reimburse the RPs for the costs and fees they incurred to attend meetings with the Trustees to discuss cooperative NRDA activities, despite the fact that the Trustees had specifically requested that the RPs representatives attend these meetings.

137.    By way of further example, and without limitation, the NPFC refused to reimburse the RPs for the costs of studies to determine whether the manipulation of vegetation encroaching on auklet breeding colonies would be a suitable restoration project,

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 46 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

despite the fact that the Trustees agreed that the study should be conducted as a Cooperative Activity between the RPs and the Trustees, the study protocols were developed in conjunction with the Trustees, and the Trustees reviewed and commented on the study interim reports.

138.   The denial by the NPFC of reimbursement of the RPs' directly-incurred NRDA costs based on these and other unsupported factual findings, blatant errors and faulty logic, speculation, and incorrect assumptions was unreasonable, arbitrary, capricious, an abuse of discretion, contrary to the OPA and its associated regulations, and otherwise not in accordance with the law.

## FOURTH CAUSE OF ACTION

139.   Plaintiffs incorporate by reference the preceding paragraphs in this Complaint as if set forth at length herein.

140.   The Second New Legal Standard applied by the NPFC to the RPs' Claim has no legal basis under the OPA, regulations adopted under the OPA, or under the law of agency. While the Second New Legal Standard correctly recognizes that the Trustees have discretion to require that a responsible party fund specific tasks as part of a cooperative NRDA, it imposes an overly-restrictive standard on how the Trustees must act when they do so. There is simply no basis in the law for the overly-restrictive standard set forth in the Second New Legal Standard.

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 47 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

141.   Even if one assumes arguendo that the NPFC may adjudicate future claims for reimbursement using the Second New Legal Standard, the Plaintiffs are entitled to an Order that the Second New Legal Standard cannot be applied retroactively to their claim.

142.   Plaintiffs are thus entitled to an Order setting aside the NPFC's determination to deny them reimbursement of NRDA costs under the Second New Legal Standard.

WHEREFORE, Plaintiffs respectfully request that this Court:

1.   Vacate and set aside the NPFC's claim determination and denial of Plaintiffs request for reconsideration based on the Second New Legal Standard on the grounds that the Second New Legal Standard is arbitrary, capricious, an abuse of discretion, a violation of the Plaintiffs' due process rights, and not otherwise in accordance with law;

2.   Vacate and set aside the NPFC's claim determination and denial of the RPs' request for reconsideration on the grounds that they were arbitrary, capricious, an abuse of discretion, a violation of Plaintiffs' due process rights, and not otherwise in accordance with the law;

3.   Award the RPs their reasonable attorneys' fees, costs, interest and disbursements herein; and

4.   Award the RPs such other and further relief as the Court may deem just and proper.

COMPLAINT TO VACATE AND SET ASIDE FINAL AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 48 of 49

SCHWABE, WILLIAMSON & WYATT, P.C.
420 L Street, Suite 400
Anchorage, AK 99501
Telephone: (907) 339-7125

1    DATED this 1 day of March, 2023.

2                                       BLACK & BUFFONE PLLC
3                                       Attorneys for Plaintiffs IMC SHIPPING CO.
                                        PTE. LTD. and AYU NAVIGATION SDN
4                                       BHD

5                                       *s/ Samuel J. Buffone, Jr.*
6                                       SAMUEL J. BUFFONE, JR.
                                        District of Columbia Bar No. 1721688
7                                       1400 Eye Street NW, Suite 200
8                                       Washington, DC 20005
                                        Telephone: (202) 997-8562
9                                       Email: *sam@blackandbuffone.com*

10                                      SCHWABE, WILLIAMSON & WYATT, P.C.
11                                      Attorneys for Plaintiffs IMC SHIPPING CO.
                                        PTE. LTD. and AYU NAVIGATION SDN
12                                      BHD

13                                      *s/ Herbert H. Ray, Jr.*
14                                      Herbert H. Ray, Jr., Alaska Bar #8811201
15                                      420 L Street, Suite 400
                                        Anchorage AK 99501
16                                      Phone: (907) 339-7125
                                        Facsimile: (503) 796-2900
17                                      E-mail: *hray@schwabe.com*

18   PDX\132980\239432\HHR\35916142.1

19

20

21

22

23

24

25

26

COMPLAINT TO VACATE AND SET ASIDE FINAL
AGENCY ACTION AND FOR OTHER RELIEF
*IMC Shipping Co. PTE. Ltd., et al. v. United States of America*
Case No. Case No. 1:23-cv-563 – Page 49 of 49